IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JACQUELINE CAZEAU, DAWN STOJKOVIC, MICHAEL ANDERSON, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>TPUSA, Inc., dba TELEPERFORMANCE USA,<br><br>        Defendant. | **MEMORANDUM DECISION AND ORDER DENYING JOINT MOTION FOR CERTIFICATION AND APPROVAL OF COLLECTIVE ACTION SETTLEMENT**<br><br>Case No. 2:18-cv-00321-RJS-CMR<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiffs Jacqueline Cazeau, Dawn Stojkovic, and Michael Anderson initiated this Fair Labor Standards Act (FLSA) action against Defendant TPUSA, Inc. in April 2018. After over a year of litigation, the parties attended mediation and entered into an agreement settling Plaintiffs' FLSA claims (Settlement Agreement). Because the parties cannot settle FLSA claims without court approval, the parties filed a Joint Motion for Certification and Approval of Collective Action Settlement,[1] asking the court to grant conditional class certification and approve the parties' Settlement Agreement. For the reasons explained below, the Motion is DENIED without prejudice.[2]

---

[1] Dkt. 44.

[2] After the parties filed the Motion, Plaintiffs and Interested Parties Chantel Headspeth and Kaylee McBride filed a Joint Motion for Decision on the Briefing or, In the Alternative, Motion for Telephonic Hearing (Motion for Decision), asking the court to decide the Motion on the briefing or to hold oral argument telephonically. Dkt. 71 at 1–2. The Motion for Decision is DENIED as moot by virtue of this Order.

1

**BACKGROUND**

Plaintiffs commenced this action in April 2018[3] and filed an Amended Complaint in July 2018.[4]  Plaintiffs asserted in their Amended Complaint two causes of action: (1) violation of the FLSA and (2) violation of the Utah Payment of Wages Act.[5]  Plaintiffs allege they were all previously TPUSA's employees in Utah and that TPUSA required its employees to arrive fifteen minutes early to work shifts and trainings but did not compensate them for that time.[6]  The Amended Complaint included an image of a "mandatory training notice that instructed employees to 'arrive at least 15 minutes before [their] class is scheduled to begin.'"[7]

Plaintiffs allege they bring "this action individually and as collective and class actions on behalf of [similarly situated employees]."[8]  Specifically, Plaintiffs propose a nationwide collective action class consisting of "[a]ll persons who are, or have been, employed by TPUSA as non-exempt employees[,] . . . who . . . failed to receive at least minimum wage for all hours worked and/or overtime compensation for hours worked in excess of 40 hours in a single work week."[9]

Before filing its Answer denying Plaintiffs' allegations, TPUSA successfully moved to dismiss Plaintiffs' Utah Payment of Wages Act claim.[10]  Thus, only Plaintiffs' FLSA claims remain.

---

[3] Dkt. 2 (Complaint).

[4] Dkt. 21 (Amended Complaint).

[5] *Id.* at 10–13.

[6] *Id.* at 2–6.

[7] *Id.* ¶ 22 (alteration in original).

[8] *Id.* ¶ 28.

[9] *Id.* ¶ 28(a).

[10] *See* Dkt. 34.  The court dismissed Plaintiffs' Utah Payment of Wages Act claim without prejudice, and Plaintiffs have not repleaded that claim.

After the court dismissed Plaintiffs' Utah Payment of Wages Act claim, the parties engaged in settlement discussions.[11]  Those discussions led to an April 2019 mediation in Los Angeles, California.[12]  Although the parties agreed to settle this case at mediation, they continued to negotiate essential terms of the settlement for months after the mediation.[13]  The parties ultimately entered into the Settlement Agreement and now move the court to conditionally certify Plaintiffs' collective action class and approve the Settlement Agreement.[14]

## LEGAL STANDARDS

### I.   Collective Action Certification

"The FLSA ensures certain employers pay their employees the minimum wage and overtime compensation if earned."[15]  To enforce its provisions, the FLSA allows employees to sue their employer as individuals or as a group, provided the group consists of "similarly situated" employees.[16]  Although the FLSA does not define the term "similarly situated,"[17] Supreme Court precedent requires courts to "determine who is similarly situated in a 'manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure.'"[18]

The Tenth Circuit recognizes three distinct approaches for determining who is similarly situated under § 216(b) of the FLSA: (1) the *ad hoc* approach, (2) the Rule 23 approach, and (3)

---

[11] Dkt. 44 at 3.

[12] *Id.*; Dkt 44-6 (Stojkovic Decl.) ¶ 10.

[13] Dkt. 44 at 3.

[14] *See* Dkt. 44; *see also* Dkt. 44-1 (Settlement Agreement).

[15] *In re Chipotle Mexican Grill, Inc.*, No. 17-1028, 2017 WL 4054144, at *1 (10th Cir. 2017) (unpublished) (citing 29 U.S.C. §§ 206–07).

[16] *See* 29 U.S.C. § 216(b).

[17] *Chipotle*, 2017 WL 4054144, at *1 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)).

[18] *Id.* (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

the spurious approach.  The court has noted the *ad hoc* approach is "[a]rguably . . . the best of the three approaches outlined because it is not tied to the Rule 23 standards."[19]  This court therefore adopts the *ad hoc* approach here.

Under the *ad hoc* approach, the court "determines, on an *ad hoc* case-by-case basis, whether plaintiffs are 'similarly situated.'"[20]  The court does this at two stages of the litigation.[21]  First, the court "makes an initial 'notice stage' determination of whether plaintiffs are 'similarly situated.'"[22]  For the court to grant this initial certification, a plaintiff must make "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan"—nothing more is required.[23]  This is a lenient standard "that typically results in class certification."[24]

Second, "[a]t the conclusion of discovery (often prompted by a motion to decertify), the court then makes a second determination, utilizing a stricter standard of 'similarly situated.'"[25]  At this final certification stage, the court relies on three factors: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."[26]  Because

---

[19] *Thiessen*, 267 F.3d at 1105.

[20] *Id.* at 1102 (citation omitted).

[21] *Id.* at 1102–03.

[22] *Id.* at 1102 (citation omitted).

[23] *Id.* (citation omitted).

[24] *McCaffrey v. Mortg. Sources, Corp.*, No. 08-2660-KHV, 2011 WL 32436, at *2 (D. Kan. Jan. 5, 2011) (citation omitted).

[25] *Thiessen*, 267 F.3d at 1102–03 (citation omitted).

[26] *Id.* at 1103 (citation omitted); *see Gassel v. American Pizza Partners, L.P.*, No. 14-cv-00291-PAB-NYW, 2015 WL 5244917, at * 2 n.3 (D. Colo. Sept. 8, 2015) ("*Thiessen* lists a fourth factor, i.e., whether plaintiffs made the filings required by the ADEA before instituting suit. . . . That factor does not apply in FLSA cases.") (citations omitted).

4

final certification occurs after discovery, "the [c]ourt can make its . . . decision with the benefit of more information about the parties and the claims."[27]

## II.    FLSA Settlement

"Congress enacted the FLSA in 1938 with the goal of protecting all covered workers from substandard wages and oppressive working hours."[28]  Indeed, the FLSA's "prime purpose . . . [is] to aid the unprotected, unorganized and lowest paid of the nation's working population."[29]  To that end, "Congress made the FLSA's provisions mandatory . . . [and its] provisions are not subject to negotiation or bargaining between employers and employees."[30]  Thus, "[w]hen employees file suit against their employer to recover back wages under the FLSA, the parties must present any proposed settlement to the district court for" its approval.[31]

"The primary focus of the [c]ourt's inquiry in determining whether to approve the settlement of a[n] FLSA collective action is not, as it would be for a Rule 23 class action, on due process concerns, . . . but rather on ensuring that an employer does not take advantage of its employees in settling their claim for wages."[32]  Accordingly, before the court can approve an FLSA settlement, the court "must first determine whether the settlement resolves a *bona fide* dispute—one that involves 'factual issues rather than legal issues such as the statute's coverage and

---

[27] *Barbosa v. Nat'l Beef Packing Co, LLC*, No. 12-2311-KHV, 2014 WL 5099423 (D. Kan. Oct. 10, 2014) (citing *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001)).

[28] *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (quotation marks, brackets, and citation omitted).

[29] *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945) (citations omitted).

[30] *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352 (11th Cir. 1982) (citation omitted).

[31] *McCaffrey*, 2011 WL 32436, at *2 (citation omitted); *see Keel v. O'Reilly Auto Enters., LLC*, No. 2:17-CV-667, 2018 WL 10509413, *2 (D. Utah May 31, 2018) ("The Tenth Circuit has not addressed whether parties can settle FLSA actions claiming unpaid wages without court approval, but district courts within this district and within the Tenth Circuit have followed the approach endorsed by a majority of courts and assumed that judicial approval is necessary.") (citations omitted).

[32] *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 719 (E.D. La. 2008) (citations omitted).

applicability.'"[33]  If the court finds a bona fide dispute lacking, it cannot approve the Settlement Agreement and its inquiry ends.  However, if the court finds a bona fide dispute exists, it must then determine whether the proposed settlement is "fair and reasonable to all parties concerned" and whether the proposed settlement "contain[s] a reasonable award of attorneys' fees."[34]

## ANALYSIS

Applying the standards described above, the court concludes (1) the proposed collective action should be certified, (2) this litigation involves a bona fide dispute, but (3) the Settlement Agreement is not fair and reasonable.  Because the court concludes the Settlement Agreement is not fair and reasonable, it must deny the Motion.

### I.   Plaintiffs' Collective Action May Be Conditionally Certified

As explained above, the court follows the two-step *ad hoc* approach for determining whether a collective action consists of "similarly situated" employees.  The first step is commonly referred to as conditional certification, and the second step is referred to as final certification.  The parties jointly move the court for conditional certification but do not move for final certification.[35] Accordingly, the court must decide (1) whether it can approve the Settlement Agreement without granting final certification and, if it can, (2) whether it should grant the parties' request for conditional certification.  The court affirmatively answers both questions.

First, the court concludes that final certification is not a prerequisite to approving the Settlement Agreement.  The Tenth Circuit has not spoken on this question, and other courts are

---

[33] *Keel*, 2018 WL 10509413, at * 2 (quoting *Kraus v. PA Fit II, LLC*, 155 F. Supp. 3d 516, 530 (E.D. Pa. 2016)).

[34] *Id.* (citations omitted).

[35] Dkt. 44 at 11–12.

split on the issue.[36]  But the court adopts the position that final certification is not required because

certification under the FLSA is "only the district court's exercise of [its] discretionary power . . .

to facilitate the sending of notice to potential class members" and "is neither necessary nor

sufficient for the existence of a representative action under FLSA."[37]  Indeed, the FLSA does not

require certification.[38]  Instead, it "requires only that the plaintiffs affirmatively provide consent

(opt in) . . . and that they be 'similarly situated.'"[39]  Thus, plaintiffs can opt into a collective action

without conditional certification,[40] and final certification is nothing more than a mechanism to

decertify the class by demonstrating the plaintiffs are not similarly situated as required by §

216(b).[41]  Accordingly, if a court uses the *ad hoc* approach, conditional certification satisfies the

---

[36] *See Mygrant v. Gulf Coast Rest. Grp., Inc.*, No. 18-0264-WS-M, 2019 WL 4620367, at *6 (S.D. Ala. Sept. 23, 2019) (concluding that final certification is unnecessary to settle an FLSA claim); *see also Tompkins v. Farmers Ins. Exch.*, No. 5:14-cv-3737, 2017 WL 4284114, at *8 n.2 (E.D. Pa. Sept. 27, 2017) (recognizing that final FLSA certification is unnecessary for approving an FLSA settlement); *Gassel*, 2015 WL 5244917, at * 2 (collecting cases that "generally make a final certification ruling before approving a collective action settlement); *see also In re Wells Fargo Wage & Hour Employment Practices Litig. (No. III)*, 18 F. Supp 3d 844, 853 (S.D. Tex. 2014) ("[C]ourts in the Fifth Circuit have never imposed such a requirement and the court is not persuaded that it is necessary or appropriate.").

[37] *Myers v. Hertz Corp.*, 624 F.3d 537, 555 n.10 (2nd Cir. 2010) (quotation marks and citation omitted); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013) ("The sole consequence of conditional certification is the sending of court-approved written notice to employees, . . . who in turn become parties to a collective action only by filing written consents with the court.") (citations omitted).

[38] In its entirety, 29 U.S.C. § 216(b)'s collective action procedure reads:

> An action to recover the liability prescribed in the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

[39] *Smith v. Metro Security, Inc.*, No. 18-953, 2019 WL 6701311, at *7 (E.D. La. Dec. 9, 2019) (citing 29 U.S.C. § 216(b)).

[40] *See Myers*, 624 F.3d at 555 n.10 ("Thus, certification is neither necessary nor sufficient for the existence of a representative action under FLSA, but may be a useful case management tool for district courts to employ in appropriate cases.") (quotation marks and citation omitted).

[41] *See In re Wells Fargo*, 18 F. Supp. 3d at 853 ("While there is a second stage in FLSA collective action cases during which the court may *decertify* the class if the plaintiffs are not similarly situated in light of information gathered during post-certification discovery, there was no need to reach the decertification stage here since the parties settled the case.").

7

FLSA's "similarly situated" requirement and final certification is unnecessary in the settlement context.[42]

Second, Plaintiffs have provided the court with sufficient information to grant conditional certification. All that is required for the court to grant conditional certification is for there to exist "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."[43] The parties allege the putative class is comprised of "approximately 48,749 hourly non-exempt TPUSA employees that may have received the Training Memorandum that requested employees arrive 15 minutes early for new hire training."[44] Further, Plaintiffs allege TPUSA did not compensate its employees for these fifteen minutes.[45] This is sufficient for the court to conclude that the putative class members' FLSA rights were violated under the same policy and thus are similarly situated.

## II.    This Litigation Involves A Bona Fide Dispute

The bona fide dispute requirement is designed to prevent parties from "negotiating around the clear FLSA requirements of compensation."[46] Accordingly, "[i]f no question exists that the plaintiffs are entitled under the statute to the compensation they seek (and therefore to liquidated damages, as well), then any settlement of such claims would allow the employer to negotiate around the statute's mandatory requirements."[47] Indeed, "implementation of the FLSA is frustrated if an employer can extract a disproportionate discount on FLSA wages in exchange for

---

[42] *See Smith*, 2019 WL 6701311, at *7 ("If a court, such as this one, does use the two-step process, the conditional certification *is* certification, and a decertification decision would be a *revision* of the original order.") (quotation marks, brackets, and citations omitted).

[43] *Thiessen*, 267 F.3d at 1102 (citation omitted).

[44] Dkt. 44 at 11.

[45] Dkt. 21 (Amended Complaint) ¶¶ 22–23.

[46] *Collins*, 568 F. Supp. 2d at 719 (citations omitted).

[47] *Id.*

an attenuated defense to payment."[48]  Thus, for a bona fide dispute to exist, there must be some

doubt concerning whether Plaintiffs may succeed on their FLSA claims.[49]

The parties bear the burden of demonstrating that a bona fide dispute exists, and they can

satisfy that burden by providing the court with sufficient information of the bona fide dispute's

existence.[50]  Such information may include:

> (1) a description of the nature of the dispute; (2) a description of the employer's
> business and the type of work performed by the employee; (3) the employer's
> reasons for disputing the employee's right to a minimum wage or overtime; (4) the
> employee's justification for the disputed wages; and (5) if the parties dispute the
> computation of wages owed, each party's estimate of the number of hours worked
> and the applicable wage.[51]

Here, the parties have provided sufficient information for the court to conclude that a bona

fide dispute exists.  First, the nature of the dispute is straightforward: Plaintiffs allege TPUSA

required them to arrive fifteen minutes early to shifts and trainings but failed to compensate them

for that time under the FLSA's wage provisions.[52]  Second, TPUSA's primary business is

providing its clients with telephone-based customer service, and TPUSA employed Plaintiffs and

the putative class members as Customer Service Representatives whose job was to provide

telephonic customer service.[53]  Third, Plaintiffs contend they are entitled to damages ranging from

$1,767,151.25 to $4,748,152.60, depending on whether their damages are calculated at minimum

---

[48] *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1242 (M.D. Fla. April 19, 2010).

[49] *See Collins*, 568 F. Supp. 2d at 719–20.

[50] *See McCaffrey*, 2011 WL 32436, at *4; *see also Felix v. Thai Basil at Thornton, Inc.*, No. 14-cv-02567-MSK-CBS, 2015 WL 2265177, at *2 (D. Colo. May 6, 2015) (citation omitted).

[51] *Felix*, 2015 WL 2265177, at *2 (citation omitted).

[52] Dkt. 21 (Amended Complaint) ¶¶ 16–26.

[53] *Id.* ¶¶ 4–7.

wage or overtime rates.[54]   TPUSA, however, contends it owes Plaintiffs nothing under (1) the *Klinghoffer* rule or (2) the *de minimis* doctrine.[55]

The *Klinghoffer* rule refers to the holding in *United States v. Klinghoffer Bros. Realty Corp.*[56]  There, the Second Circuit held that an employer complies with the FLSA's minimum wage requirement "so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statutes, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement."[57]

The *de minimis* rule dictates that "employees cannot recover for otherwise compensable time if it is *de minimis*,"[58] i.e., time that is "insubstantial and insignificant."[59]  There is no specific amount of time that qualifies as *de minimis*.[60]  Instead, this rule relies on the application of "common sense . . . to the facts of each case"[61] and the weighing of four factors: (1) "the amount of daily time spent on the additional work," (2) "the practical administrative difficulty of recording the additional time," (3) "the size of the claim in the aggregate," and (4) "whether the claimants performed the work on a regular basis."[62]

---

[54] Dkt. 44 at 13.  The court notes that Plaintiffs did not address what their damages would be if they accounted for the FLSA's liquidated damages provision.  *See* 29 U.S.C. § 216(b) (explaining that damages for violating the FLSA will include the amounts of unpaid wages and "an additional equal amount as liquidated damages.").  If they had, their damages would range from $3,534,302.50 to $9,496,305.20.

[55] Dkt. 44 at 13–14.

[56] 285 F.2d 487 (2nd Cir. 1960).

[57] *Id.* at 490.

[58] *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984) (citation omitted).

[59] *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 693 (1946).

[60] *Lindow*, 738 F.2d at 1062.

[61] *Id.*

[62] *Reich v. Monfort, Inc.*, 144 F.3d 1329, 1333–34 (10th Cir. 1998) (citations omitted).

TPUSA's reliance on these defenses creates a bona fide dispute.[63]  First, TPUSA alleges it paid its employees an average of $12.99 per hour and therefore the total pay received by employees during the workweek divided by the hours actually worked exceeded the minimum wage.[64] Assuming these allegations are true and the Tenth Circuit adopts the *Klinghoffer* rule, Plaintiffs' claim that TPUSA violated the FLSA's minimum wage provision could fail.[65]  Similarly, application of the *de minimis* doctrine calls into question the likelihood of success on Plaintiffs' claim because it is unclear whether fifteen minutes aggregated over a four-week period qualifies as *de minimis*.[66]  The court concludes a bona fide dispute exists.

### III.   The Settlement Agreement Is Not Fair and Reasonable

"To be fair and reasonable, an FLSA settlement must provide adequate compensation to the employee and must not frustrate the FLSA policy rationales."[67]  The court has carefully reviewed the Settlement Agreement and concludes it contains provisions that are inherently unfair, unreasonable, and contradictory to the FLSA's underlying policies.[68]  Below, the court addresses

---

[63] Dkt. 35 (Answer) at 10–11.

[64] Dkt. 44 at 14.

[65] The parties did not cite a Tenth Circuit case applying the *Klinghoffer* rule, and the court has not found a Tenth Circuit case doing so.  Nevertheless, it appears likely the Tenth Circuit would follow the *Klinghoffer* rule.  *See Campbell v. C.R. England, Inc.*, No. 2:13-cv-00262, 2015 WL 5773709, at *2 (D. Utah Sept. 30, 2015) ("When calculating damages for minimum wages under the FLSA, most courts follow the so-called *Klinghoffer* rule, meaning that an employer does not violate the federal minimum wage unless, when wages are averaged over an entire workweek, the average wage is less than the federal minimum.") (citations omitted).

[66] *Compare Lindow*, 738 F.2d at 1064 (affirming the application of the *de minimis* doctrine to employees' claim, even though the employees were required to come in fifteen minutes early, "because of the administrative difficulty of recording the time and the irregularity of the additional pre-shift work."), *with Reich*, 144 F.3d at 1333–34 (affirming the rejection of the *de minimis* doctrine to employee's claim, even for a time period of approximately eleven and half minutes each work day over two to three years, because the factors favored the employees.).

[67] *McMillian v. BP Service, LLC*, No. 19-2665-DDC-TJJ, 2020 WL 969870, at *2 (D. Kan. Feb. 28, 2020) (citation omitted).

[68] *See Johnson v. Citrus Cty. Assoc. for Retarded Citizens, Inc.*, No. 5:17-cv-216-Oc-32PRL, 2017 WL 7311891, at *1–2 (M.D. Fla. July 12, 2017) (refusing to approve a settlement agreement with "inappropriate" provisions); *see also Barbosa*, 2014 WL 5099423, at *7–8 (same).

those provisions and other issues it has identified with the Settlement Agreement to help guide the parties should they reapply for approval of an amended settlement agreement.

### A.  A Fairness Hearing Would Be Premature

Courts typically hold fairness hearings to determine whether an FLSA settlement is fair and reasonable "unless the parties notify the court that the opt-in plaintiffs had notice of the settlement and an opportunity to object."[69]  The court will not schedule a fairness hearing because it will not approve the Settlement Agreement unless or until the parties provide additional information to the court and remove certain provisions as explained below.

### B.  The Opt-In Procedure Is Not Consistent With the FLSA

Under the FLSA, "similarly situated" employees may opt into the action by filing with the court their written consent "to become such a party."[70]  The Settlement Agreement, however, does not follow this opt-in procedure and therefore cannot be approved.  Specifically, the Settlement Agreement proposes sending checks to putative class members who will then consent to joining this action by endorsing the check.[71]  Although this procedure satisfies the first § 216(b) requirement that opt-in plaintiffs give written consent to joining the action, it fails to satisfy or address the second requirement: that the written consents be filed with the court.[72]  If the parties wish to reapply for approval of an amended settlement agreement, the parties may satisfy the § 216(b) filing requirement by certifying to the court a list of names of the people who cash their checks or otherwise proposing a method that satisfies the statutory requirements.

---

[69] *Stubrud v. Daland Corp.*, No. 14-2252-JWL, 2015 WL 5093250, at *1 (D. Kan. Aug. 28, 2015) (citations omitted).

[70] 29 U.S.C. § 216(b).

[71] Dkt. 44-1 (Settlement Agreement) ¶ 10(C).

[72] *See* 29 U.S.C. § 216(b).

Additionally, unlike other collective actions that settle after the case has been conditionally certified and opt-in plaintiffs have joined the action, this case has not yet been conditionally certified, and no opt-in plaintiffs have joined.  The Settlement Agreement contemplates that putative class members opt into the action and join the settlement at the same time without an opportunity to object to the Settlement Agreement.[73]  The parties explain that "[c]ombining the notice to opt in with the settlement check will reduce the administration cost by 50% and thereby preserve the settlement funds to benefit the class."[74]  Although an important consideration, the court requests that the parties provide additional analysis to justify their proposed procedure if they seek approval of an amended settlement agreement.  Specifically, the parties should provide additional reasoning—supported by case law—explaining why the court should agree to the procedure rather than follow courts that have refused.[75]

### C.  The Confidentiality Provision is Impermissible

"There is broad consensus that FLSA settlement agreements should not be kept confidential"[76] because "compelled silence unreasonably frustrates implementation of the 'private–public' rights granted by the FLSA and thwarts Congress's intent to ensure widespread compliance with the statute."[77]

---

[73] *Id.* ¶ 10.

[74] Dkt. 44 at 9.

[75] *E.g., Christeson v. Amazon.com.ksdc, LLC*, No. 18-2043-KHV, 2019 WL 354956, at *3–5 (D. Kan. Jan. 29, 2019) ("When putative class members have not yet received notice of the lawsuit and an opportunity to opt in, the Court cannot sustain a motion for final settlement approval. . . . Further, the Court's ability to assess the appropriateness of final certification, fairness of the settlement terms and reasonableness of the agreed fee award is undermined when plaintiff has not provided putative class members notice and an opt-in opportunity before seeking final settlement approval.") (citations omitted).; *Mygrant*, 2019 WL 4620367, at *1–2 (allowing the parties to obtain "preliminary approval" of a settlement agreement during the pre-notice stage of an FLSA case).

[76] *Stubrud*, 2015 WL 5093250, at *1.

[77] *Dees*, 706 F. Supp. 2d at 1242.

13

The Settlement Agreement includes a confidentiality provision, but the parties do not address whether it is fair and reasonable.[78]  Specifically, that provision reads:

> **Non-disclosure and Non-publication**.  Plaintiffs and Class Counsel agree not to disclose or publicize the Settlement Agreement contemplated herein, the fact of the Settlement Agreement, its terms or contents, or the negotiations underlying the Settlement Agreement, in any manner or form, directly or indirectly, to any person or entity, except to Settlement Class members, and as shall be contractually or legally required to effectuate the terms of the Settlement Agreement as set forth herein, including, but not limited to, providing a copy of the Settlement Agreement to the Court for approval.[79]

The court will not approve a settlement agreement with this provision because it "contravenes the legislative purpose of the FLSA and undermines the Department of Labor's regulatory effort to notify employees of their FLSA rights."[80]  Indeed, the court will not approve a settlement agreement with a provision that prohibits Plaintiffs or their counsel from discussing this case with TPUSA's employees.[81]  Nor will the court enforce a provision that prohibits Plaintiffs and their counsel from discussing the Settlement Agreement because it is a document the parties have made available to the public by filing it with the court.[82]  Further, this confidentiality provision is especially troubling given the allegation that TPUSA "was sued for nearly the same wage violations in 2008."[83]  Accordingly, the court will not approve the Settlement Agreement with this or a substantially similar provision.

---

[78] *See* Dkt. 44 at 14–17.

[79] Dkt. 44-1 (Settlement Agreement) ¶ 18.

[80] *Dees* 706 F. Supp. 2d at 1242.

[81] *See Stubrud*, 2015 WL 5093250, at *1 ("Because the parties' agreement contains a provision that would penalize class members from disclosing the terms except in narrow circumstances, the court will not approve an agreement containing this provision.").

[82] *See Barbosa*, 2014 WL 5099423, at *8 ("This confidentiality clause cannot be enforced.  The settlement agreement is a public document, and its terms are in the public domain.").

[83] Dkt. 21 (Amended Complaint) at 11 ¶ 6.

### D.  The Release Lacks Consideration

In the FLSA context, "general releases (the release is not limited to claims arising under the FLSA) . . . are disfavored [because] 'a pervasive release in an FLSA settlement confers an uncompensated, unevaluated, and unfair benefit on the employer.'"[84]  Nevertheless, "courts will approve broad releases accompanying FLSA settlements when the plaintiff is receiving full compensation of his or her FLSA claim, *as well as* additional consideration for a general release."[85] In other words, the court will not approve an FLSA settlement containing a general release unless it is supported by adequate additional consideration.

The Settlement Agreement contains two general releases—one for Settlement Class members, including Plaintiffs, and another for Plaintiffs alone.  Those provisions read:

> **Release.**        Plaintiffs and every member of the Settlement Class will fully release and discharge TPUSA, its past and present officers, directors, shareholders, employees, agents, principals, heirs, representatives, accountants, attorneys, auditors, consultants, and insurers, and TPUSA's respective predecessors and successors in interest, parents, subsidiaries, affiliates, related entities, and any of their predecessors, successors, and assigns (all, collectively, the "Released Parties"), as follows:
>
> A.        Release by Settlement Class members (including Plaintiffs).  Settlement Class members shall release all claims, demands, rights, damages, liabilities, and causes of action under federal, state, local, and/or common law that are or were asserted in the Action, or that could have been asserted based on the factual allegations in the Action, that arose during the Class Period, including, but not limited to, with respect to the following claims: (a) failure to pay overtime wages; (b) failure to pay minimum wages; and (c) all claims for liquidated damages, civil penalties or attorney fees under the FLSA or state law (all, collectively the "Released Claims").  This release will encompass all claims, demands, rights, damages, liabilities, and causes of action under federal, state, local, and/or common law up to and including the date on which the Settlement Agreement is approved by the Court that are or were asserted in the Action, or that could have been asserted

---

[84] *Johnson*, 2017 WL 7311891, at *2 (quoting *Moreno v. Regions Bank*, 729 F. Supp. 2d 1346, 1351–52 (M.D. Fla. 2010)); *see Barbosa*, 2014 WL 5099423, at * 8 (citing *Gambrell v. Weber Carpet, Inc.*, No. 10-2131-KHV, 2012 WL 5306273, at *5 (D. Kan. Oct. 29, 2012)) ("It is inappropriate to require plaintiffs to sign overly-broad releases to receive settlement proceeds in FLSA cases.").

[85] *Johnson*, 2017 WL 7311891, at *2 (emphasis added).

based on the factual allegations in the Action. Specifically excluded from the Release Claims are any claims for unemployment insurance, workers' compensation benefits, or any other claims that cannot be waived by law.

B.    Additional Release by Plaintiffs.  Plaintiffs shall release, in addition to their Released Claims, all claims, demands, rights, damages, and liabilities under federal, state, local, and/or common laws, applicable orders, and regulations, whether known or unknown, pending or contingent, they may have against the Released Parties, to the maximum extent permitted by law ("Plaintiffs' Released Claims"). Specifically excluded from Plaintiffs' Released Claims are any claims for unemployment insurance, workers' compensation benefits, or any other claims that cannot be waived by law. . . .[86]

The Plaintiffs' release in Section B is a general release that demands release of all claims under "federal, state, local, and/or common laws, applicable orders, and regulations, whether known or unknown, pending or contingent, they may have against the Released Parties."[87] At best, the Settlement Class release language is imprecise.  For example, it is unclear exactly what falls within the scope of "all claims, demands, rights, damages, liabilities, and causes of action . . . that could have been asserted based upon the factual allegations in the Action."[88]  At worst, given the nature of the relationship between TPUSA as employer and the Settlement Class members as employees or former employees, this language may amount to a release that operates as a general release in practice and effect.  For reasons explained below, the court is concerned that this ambiguity is designed to preserve arguments TPUSA may intend to present in other pending actions to foreclose related but arguably different claims asserted by other former employees.

These concerns aside, it appears these releases are not supported by consideration.  The Settlement Agreement includes three forms of consideration that could arguably support the

---

[86] Dkt. 44-1 (Settlement Agreement) ¶ 3.

[87] *Id.* ¶ 3(B).

[88] *Id.* ¶ 3(A).

general releases: (1) the Gross Settlement Amount,[89] (2) the FLSA Compliance provision,[90] and (3) the Incentive Award provision.[91]  But each of these forms of consideration are insufficient to justify the general releases.

To begin, the Gross Settlement Amount contemplated in the Settlement Agreement is not fair and reasonable consideration for the general releases.  This is because TPUSA is required to pay the wages owed under the FLSA, and Plaintiffs may compromise their FLSA claims if the compromise is fair and reasonable.[92]  But "concessions unrelated to the substance of the FLSA claims have no place in FLSA settlements" and "should not be used as leverage to procure a general release of all possible claims."[93]  The compromises proposed in the Settlement Agreement may fairly represent consideration for the reduced payment TPUSA has agreed to make—an amount much smaller than it may have been liable for if the case proceeded to trial.[94]  But the parties provide the court no basis on which to conclude the Gross Settlement Amount also provides

---

[89] The parties agreed to settle Plaintiffs' FLSA claims, in part, for a payment from TPUSA of $550,000.00 (the Gross Settlement Amount).  *See* Dkt. 44-1 (Settlement Agreement) ¶ 4.

[90] *Id.* ¶ 6.

[91] *Id.* ¶ 8.

[92] *See Moreno*, 729 F. Supp. 2d at 1350–52.

[93] *Sanchez v. RM Wireless, Inc.*, No. 6:17-cv-1785-Orl-22TBS, 2018 WL 1866050, at *3 (M.D. Fla. Mar. 28, 2018) (citations omitted).

[94] It is clear Plaintiffs have come to a compromise on their FLSA claims by entering into the Settlement Agreement. Assuming Plaintiffs are entitled to recover damages under only the FLSA's minimum wage provision, TPUSA would be liable for approximately $3,534,302.50, which would result in Plaintiffs and opt-in plaintiffs receiving about $72.50 each.  *See* Dkt. 44 at 13 (alleging Plaintiffs' damages under the FLSA's minimum wage provision to be $1,767,151.25); *see also* 29 U.S.C. § 216(b) (providing for liquidated damages equal to the unpaid wages).  But the parties agreed to settle this matter for the Gross Settlement Amount.  *See* Dkt. 44-1 (Settlement Agreement) ¶ 4.  From the Gross Settlement Amount, the parties agreed to pay the administrative fees ($103,100), Plaintiffs' incentive fees ($27,500), Plaintiffs' attorney fees (an estimated $183,315), actual costs and expenses ($12,000), and the payroll taxes due on the wage portion of the payments.  *Id.*  Plaintiffs and each opt-in plaintiff would therefore receive approximately $4.60 under the Settlement Agreement.  This may be a fair and reasonable compromise of the claim in light of TPUSA's defenses, but the court does not address that issue in this Order.  *See Moreno*, 729 F. Supp. 2d at 1348 ("Problems, for example, in proving hours-worked or 'non-exempt' status—or the presence of some other lawful defense to payment (if any)—may warrant a reasonable compromise, if the court approves.").

consideration for the general releases  Indeed, the parties do not characterize the Gross Settlement Amount as consideration for the general releases.

Next, the FLSA Compliance provision in the Settlement Agreement is essentially valueless.  That provision reads:

> **FLSA Compliance**.  TPUSA agrees as a material term and condition of this Settlement Agreement that it will continue to comply with the Fair Labor Standards Act's minimum wage and overtime requirements, and that it will compensate employees for all hours worked during new-hire training sessions and regularly scheduled work shifts.  TPUSA certifies and represents that it has affirmatively revoked and rescinded the Training Memorandum and does not require employees to arrive early for new hire trainings.[95]

Plaintiffs are no longer TPUSA employees and therefore derive no benefit from this provision.[96]  Further, the court lacks information concerning the number of putative opt-in plaintiffs that remain TPUSA employees, and therefore cannot determine what value, if any, putative opt-in plaintiffs may gain from this provision.

More importantly, while "a non-cash, but still valuable, concession by an employee" may qualify as consideration for a general release,[97] TPUSA makes no concessions under this provision.  Instead, TPUSA agrees to "*continue to comply* with the Fair Labor Standards Act's minimum wage and overtime requirements,"[98] which it is already required to do.[99]  And though TPUSA represents it has revoked the Training Memorandum and does not require its employees

---

[95] Dkt. 44-1 (Settlement Agreement) ¶ 6.

[96] Dkt. 21 (Amended Complaint) ¶¶ 4–6.

[97] *Moreno*, 729 F. Supp. 2d at 1348.

[98] Dkt. 44-1 (Settlement Agreement) ¶ 6 (emphasis added).

[99] *See Moreno*, 729 F. Supp. 2d at 1348–49 ("A gratuitous concession in exchange for the required payment is 'unfair' because (1) the FLSA obligates the employer without exception or condition to pay the full amount owed and (2) a valuable, non-cash concession extended to the employer in exchange for otherwise 'full compensation' effectively reduces the employer's payment by an amount equal to the value of the concession (and accordingly reduces the employer's payment to less than 'full compensation.'").

to arrive early to trainings, it relies on similar representations to defend itself in this lawsuit.[100] It is unclear what value, if any, TPUSA's representations have in this settlement. Further, TPUSA makes no promise to not later require its employees to arrive early for trainings under the potential justification that the time is *de minimis*. Accordingly, this provision is not adequate consideration for the general releases.

Lastly, the parties have classified Plaintiffs' incentive awards, at least in part, as consideration "for Plaintiffs' general release of claims."[101] But the court is not convinced it is reasonable to utilize incentive awards, which are designed to "induce individuals to become named representatives," as consideration for a general release.[102] Thus, if the court approves Plaintiffs' incentive awards, it will be for "their service in prosecuting the action and for the risks they have incurred," not as consideration for Plaintiffs' general release.[103]

In sum, the court cannot find adequate consideration for the general releases and therefore cannot approve the Settlement Agreement on this independent ground.[104] Absent additional consideration, the release provisions must be appropriately limited.

### E.  The Release is Overbroad

"It is inappropriate to require plaintiffs to sign overly-broad releases to receive settlement proceeds in FLSA cases."[105] The Settlement Agreement includes a release provision covering a

---

[100] *See* Dkt. 44 at 13 (arguing that a bona fide dispute exists because TPUSA "represents that the Training Memorandum was not an official company policy and was not authorized by management.").

[101] Dkt. 44-1 (Settlement Agreement) ¶ 8; *see id.* ¶ 4(C)(3) (explaining that the incentive awards are "in recognition of Plaintiffs' general release claims, contributions to the Action, and their service to the Settlement Class.").

[102] *Robles v. Brake Masters Sys., Inc.*, No. CIV 10-0135 JB/WPL, 2011 WL 9717448, at *5 (D. N.M. Jan. 31, 2011) (quoting *UFCW Local 880—Retail Food Emp'rs. Joint Pension Fund v. Newmont Mining Corp.*, 352 F. App'x 232, 235–36 (10th Cir. 2009) (unpublished)).

[103] *Alvarez v. BI Inc.*, No. 16-2705, 2020 WL 1694294, at *12 (E.D. Pa. April 6, 2020).

[104] *See Johnson*, 2017 WL 7311891, at *2 (citing cases that approved releases when there was consideration in addition to the amount owed under the FLSA).

[105] *Barbosa*, 2014 WL 5099423, at *8 (citation omitted).

number of parties associated with TPUSA, which the parties refer to as the Released Parties.[106]

"While [the court] recognize[s] that [TPUSA] want[s] finality, the exceptionally broad language

used here is not narrowly tailored to achieve this end and [will] not be approved."[107]  Instead,

TPUSA may, for example, define Released Parties to include "any other person or entity associated

with TPUSA that was Settlement Class members' 'Employer' as defined by the FLSA."[108]

 In addition, it is unclear how broadly the parties are interpreting the release and whether

the parties agree on its scope.  As discussed above, the Settlement Class members' release provides

for the release of federal and state law claims "that are or were asserted in the Action, or that could

have been asserted based on the factual allegations in the Action, that arose during the Class

Period."[109]  TPUSA interprets this language to encompass any claims based on allegations that

TPUSA failed to compensate its employees for pre-training and pre-shift time,[110] and Plaintiffs

have not provided their interpretation of this language.  Because the Settlement Agreement is based

on a specific, limited amount of time—fifteen minutes each day for approximately four weeks—

and there has been no formal discovery except for initial disclosures, the court is concerned

putative class members may unintentionally waive claims that Plaintiffs never investigated or

litigated.[111]  If the parties wish to seek future approval of an amended settlement agreement, they

---

[106] Dkt. 44-1 (Settlement Agreement) ¶ 3.

[107] *Sanchez*, 2018 WL 1866050, at *3.

[108] *See id.*

[109] Dkt. 44-1 (Settlement Agreement) ¶ 3(A).

[110] *See* Dkt. 60 at 1–3 ("Plaintiffs' claims are expressly not limited to pre-training time, but encompass their entire 'period of employment with TPUSA.'"); *see also* Dkt. 52-5 at 7–8 (arguing the release would have a dispositive effect on TPUSA employees' claims based on allegations that TPUSA required them to engage in pre-shift activities that lasted between five and forty-five minutes each day during their employment).

[111] Plaintiffs describes their contentions as, "Defendant did not compensate them for pre-shift work during a 4 week new hire training session." Dkt. 44-3 (Snow Decl.) ¶ 4.  And Plaintiffs appear to limit the scope of the Settlement Agreement as covering only the allegations concerning unpaid time during the new hire training period. *See* Dkt. 59 at 4 n.2 (explaining that the Settlement Agreement is limited to the allegation that TPUSA failed to pay its employees for "arriving early during only the new hire training period.").

are directed to provide additional information addressing the court's concern with TPUSA's broad interpretation of the release.  Notably, if the parties mutually intend the release to operate as broadly as TPUSA suggests, then the court has grave concerns about the fairness and reasonableness of the settlement.

### F.  The Proposed Notice Is Insufficient

This court has authority to "prescrib[e] the terms and conditions of communication from the named plaintiffs to the potential members of the class on whose behalf the collective action has been brought."[112]  In exercising that authority, it is the court's duty to ensure the notice provides sufficient information to the putative class members so they may "make an informed choice as to whether to participate in" the action.[113]  Generally,

> [a] notice should include, at a minimum: the purpose of the notice, the nature of the lawsuit, the proposed class composition, the legal effect of joining the lawsuit, the fact that the court has not taken any position regarding the merits of the lawsuit, how to join the lawsuit, the purely voluntary nature of the decision and the legal effect of not joining the lawsuit, the prohibition against retaliation, and the relevant contact information for inquiries.[114]

Exercising its authority under these standards, the court cannot approve the parties' proposed notice[115] for the following reasons.

---

[112] *Hoffmann-La Roche*, 493 U.S. at 169; *see Zhongle Chen v. Kicho Corp.*, No. 18 CV 7413 (PMH) (LMS), 2020 WL 1900582, at *8 (S.D.N.Y. April 17, 2020) ("The content of the notice is left to the broad discretion of the district court.") (citation omitted); *see also Self v. TPUSA, Inc.*, No. 2:08cv395, 2008 WL 4372928, at *2 (D. Utah Sept. 19, 2008) ("Because of the potential for abuse in class actions and FLSA collective actions, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties.") (quotation marks and citation omitted).

[113] *Rogers v. WEBstaurant Store, Inc.*, No. 4:18-cv-00074, 2018 WL 3058882, at *6 (quoting *Billingsley v. Citi Trends, Inc.*, 560 F. App'x. 914, 922 (11th Cir. 2014)).

[114] *Zhongle Chen*, 2020 WL 1900582, at * 9 (quoting *Hernandez v. City of New York*, No. 16 Civ. 3445 (RA), 2017 WL 289816 (S.D.N.Y. June 29, 2017)).

[115] *See* Dkt. 44-4 (Notice).

First, the section "***How do I opt in or become a part of the Litigation and Settlement?***"[116] is deficient because it does not accurately explain the FLSA's opt-in process.  The recipients of the notice are not required to opt into this action, and the notice must include language clearly explaining that the recipient's decision to participate in this action is purely voluntary. Additionally, the notice must include language explaining that the opt-in plaintiffs will not join the action unless their names are filed with the court and clarifying who is expected to fulfill this requirement (e.g., Plaintiffs' counsel or the opt-in plaintiff).  Lastly, the notice must include a clear statement explaining the legal effect of joining this action, i.e., that whoever opts into the action will be bound by its outcome, including the terms of the Settlement Agreement.

Second, the section "***What claims will I release if I cash the settlement check?***"[117] is deficient because it does not define the scope of the release.  Specifically, that section explains the release covers "any and all claims under the [FLSA] . . . and state law claims that are or could be based on or related to *the same matters alleged in the Action*."[118]  But the notice does not explain what matters have been alleged.  Instead, the notice repeatedly refers to allegations that TPUSA issued a notice requiring employees to arrive fifteen minutes early to new hire trainings and merely states: "The Litigation alleges that TPUSA failed to pay Potential Settlement Class members for all minimum and overtime wages."[119]  This is insufficient because it does not explain what claims putative class members would be releasing if they cash their check.  Further, the notice does not provide a fair explanation concerning the nature of the lawsuit.  Accordingly, the notice must include additional information concerning the nature of the action and Plaintiffs' allegations so

---

[116] *Id.* at 3.

[117] *Id.*

[118] *Id.* (emphasis added).

[119] *Id.* at 1–2.

putative class members can make an informed decision about whether to join this action and what claims they may waive if they do so.

Third, the section "*What happens if I do not cash the check?*"[120] is deficient because it does not clearly explain that putative class members who do not cash the check will not be bound by the outcome of this action or the Settlement Agreement. The notice must include additional language explaining the legal effect of not joining this action, including preservation of rights to independently pursue claims.

Fourth, the section "*How can I get additional information?*"[121] is deficient because it does not inform putative class members of their right to seek legal advice from their own counsel. Further, to avoid ambiguity, the parties should amend the last sentence in this section to provide Plaintiffs' counsel's contact information instead of stating "the contact information listed above."[122] And where the notice provides contact information for the parties' attorneys, "Attorneys for Plaintiffs/the Settlement Class" should be changed to "**Class Counsel**," and "Attorneys for Defendant" should be changed to "**Attorneys for TPUSA**."[123]

Fifth, the notice fails to notify putative class members of their ability to receive a copy of the Settlement Agreement from Plaintiffs' counsel before joining this action. The court will not approve a settlement unless the putative class members have the ability to receive and review the settlement agreement from Plaintiffs' counsel and are informed of their ability to do so.[124]

---

[120] *Id.* at 3.

[121] *Id.*

[122] *Id.*

[123] *Id.* at 2.

[124] Alternatively, the notice can provide a website address where putative class members can find and review the Settlement Agreement.

Sixth, the notice does not clearly state that the court has taken no position on the merits of Plaintiffs' allegations. Accordingly, the parties must add language to that effect.

Seventh, an FLSA lawsuit against TPUSA is currently pending in the United States District Court for the District of Ohio (Ohio Action). Before the parties sought approval of their Settlement Agreement, the Ohio Action's plaintiffs sought conditional certification of their FLSA claims.[125] Specifically, they sought permission to notify putative class members, which would consist only of TPUSA employees in Ohio, of their ability to join that action.[126] In response, TPUSA argued the Ohio Action should be stayed and not be certified because the Settlement Agreement's release would "resolv[e] a substantial percentage of the proposed [Ohio class] members' claims."[127] The Ohio Court agreed with TPUSA and stayed its decision on the Ohio plaintiffs' motion for conditional certification pending resolution of this case.[128] Nevertheless, "Plaintiffs have offered to amend the [notice] in this action to include a specific disclosure of the Ohio Action and to provide the contact information of counsel in the Ohio Action so that potential class members can make an informed decision."[129] Thus, because putative class members in Ohio have not received notice of the Ohio Action, the notice in this case must include Plaintiffs' proposed amendment.[130]

In sum, the court will not approve any notice unless the parties resolve each of the issues described above.

---

[125] Dkt. 52 at 5.

[126] *See* Dkt. 52-2.

[127] Dkt. 52-5 at 6.

[128] Dkt. 69-1.

[129] Dkt. 59 at 3–4. It does not appear that TPUSA has agreed to Plaintiffs' proposed amendment.

[130] The language for the proposed amendment can be found at Dkt. 59 at 4 n.2.

24

### G. Incentive Awards

The Settlement Agreement provides that Plaintiffs may request incentive payments from the Gross Settlement Amount without TPUSA opposing that request.[131]  Specifically, the requested incentive payments include $12,500 to Cazeau, $12,500 to Stojkovic, and $2,500 to Hughes (formerly Anderson).[132]  At this time, however, the court cannot approve the requested payments because it lacks sufficient information justifying the requested awards.

The court "must examine any service award payments to determine whether they are fair and reasonable."[133]  One court has found incentive awards "are justified only when a class representative is not forthcoming, when a class representative undertakes risk, or when the class representative's efforts exceed the effort of a typical class representative or individual plaintiff."[134]  Another court looked to the amount of time named plaintiffs expended on the case to justify an award.[135]

Plaintiffs here contend they are entitled to the requested incentive awards because of their efforts throughout this litigation.[136]  To support their requested award, Plaintiffs submit declarations from Plaintiffs' counsel,[137] Cazeau,[138] and Stojkovic.[139]  But the declarations do not provide sufficient information for the court to determine if the requested incentive awards are

---

[131] Dkt. 44-1 (Settlement Agreement) ¶ 8.

[132] *Id.*

[133] *Lopez v. El Mirador, Inc.*, No. CV 16-01257 RB-KBM, 2018 WL 582577, at *6 (D. N.M. Jan. 26, 2018) (citations omitted).

[134] *Id.* at *7 (*citing Robles*, 2011 WL 9717448, at *5) (quotation marks omitted).

[135] *See Barbosa v. Nat'l Beef Packing Co., LLC*, No. 12-2311-KHV, 2015 WL 4920292, at *6 (D. Kan Aug. 18, 2015).

[136] Dkt. 44 at 23–24.

[137] Dkt. 44-3 (Snow Decl.).

[138] Dkt. 44-5 (Cazeau Decl.).

[139] Dkt. 44-6 (Stojkovic Decl.).

justified.  For example, the declarations do not provide any indication concerning the number of hours Plaintiffs spent assisting in the litigation.[140]  There is also no explanation why Cazeau and Stojkovic should receive the same awards when Stojkovic traveled to California for mediation, but Cazeau did not.[141]  And the details provided concerning Hughes' involvement with the case do not appear to justify his requested award.  Accordingly, the court cannot approve the requested incentive awards at this time.

If Plaintiffs seek incentive awards in the future, they should provide details concerning their involvement with the case and address the following factors:

> [1] the actions the class representative has taken to protect the interests of the class, [2] the degree to which the class has benefitted from those actions, [3] the amount of time and effort the class representative has expended in pursuing the litigation, and [4] the risks the class representative faced in pursuing the action.[142]

The court is disinclined to grant incentive awards in a manner that would reduce the Gross Settlement Amount and thus the amount available to putative class members unless there is some showing that Plaintiffs' efforts have been "greater than the efforts a class representative would have incurred if his or her action were an individual action and not a class action."[143]

## H.  Attorney Fees

"The final factor a court must inspect in scrutinizing a proposed settlement is whether the attorney's fees are reasonable."[144]  Because the court will not approve the Settlement Agreement for the reasons addressed above, "an analysis of the attorney's fees and costs is premature."[145]

---

[140] *See* Dkt. 44-3 (Snow Decl.) ¶ 32; *see also* Dkt. 44-5 (Cazeau Decl.) ¶ 8; Dkt. 44-6 (Stojkovic Decl.) ¶¶ 9–10.

[141] *See* Dkt. 44–5 (Cazeau Decl.) ¶ 8; *see also* Dkt. 44-6 (Stojkovic Decl.) ¶¶ 10.

[142] *Robles*, 2011 WL 9717448, at *12 (citing *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).

[143] *Id.* at *13.

[144] *Lopez*, 2018 WL 582577, at *8 (citation omitted).

[145] *Id.* (citation omitted).

Accordingly, the court declines Plaintiffs' uncontested request for attorney fees but will consider the request if the parties reapply for approval of an amended settlement agreement.

## CONCLUSION

For the foregoing reasons, the court DENIES the parties' Joint Motion[146] without prejudice. The court DENIES Plaintiffs and Interested Parties' Motion for Decision[147] because it is rendered moot by this decision.

SO ORDERED this 2nd day of July 2020.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[146] Dkt. 44.

[147] Dkt. 71.

27